JANET L. STRUNK                                                    PLAINTIFF

            v.              Civil No. 05-2041

UNUM LIFE INSURANCE
COMPANY OF AMERICA                                                 DEFENDANT

**O R D E R**

Now on this 6th day of November, 2006, the captioned matter comes on for review, and from the Administrative Record, and the briefs of the parties, the Court finds and orders as follows:

1.   Plaintiff Janet L. Strunk ("Strunk") is a participant in a short term disability plan (the "Plan") provided by her employer, Healthsouth Corporation, and insured under a group insurance policy (the "Policy") by Unum Life Insurance Company of America ("Unum").  Strunk was found eligible for benefits under the Plan, but later terminated, and now appeals the termination decision.

2.   The Plan is governed by the provisions of the Employee Retirement Income Security Act ("ERISA").  Denial of ERISA benefits is "reviewed on a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  **Firestone Tire & Rubber Co. v. Bruch**, **489 U.S. 101, 115 (1989)**.  If the administrator has discretionary authority, its eligibility decisions are reviewed for abuse of that discretion.

**Groves v. Metropolitan Life Insurance Co.**, 438 F.3d 872 (8th Cir. 2006).

The Plan here provides that "[w]hen making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." The Court will, therefore, review Hartford's benefits decisions for abuse of discretion.

3. The abuse of discretion standard has been described as follows:

> In applying an abuse of discretion standard, we must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision. A reasonable decision is fact based and supported by substantial evidence. We may consider both the quantity and quality of evidence before a plan administrator. And we should be hesitant to interfere with the administration of an ERISA plan.

**Groves**, 438 F.3d 872, 875 (internal citations and quotation marks omitted).

"Substantial evidence" is "more than a scintilla but less than a preponderance." **Leonard v. Southwestern Bell Corp. Disability Income Plan**, 341 F.3d 696, 701 (8th Cir. 2003).

Although abuse of discretion review puts a heavy burden on a participant whose benefits have been terminated, it does not amount to "rubber-stamping the result." A termination decision must be reasonable, i.e., "supported by substantial evidence that is assessed by its quantity and quality." **Torres v. UNUM Life**

**Insurance Co. of America**, 405 F.3d 670, 680 (8th Cir. 2005).

4.   With the foregoing principles in mind, the Court has examined the Administrative record, from which it has derived the following relevant facts:

* The Policy provides, in relevant part, that a participant is disabled "when Unum determines that: you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury. . . ."

* The Policy further provides that a claim ends on the occurrence of any one of several defined events.  For our purposes, the relevant event is "the date you are no longer disabled under the terms of the plan. . . ."

* On June 24, 2003, Strunk, a Medical Records Supervisor at Healthsouth, submitted a claim under the Plan to Unum.  The diagnosis supporting her claim was "cervicalgia," or neck pain.  Strunk sought benefits starting June 11, 2003, having gone off work on June 10, 2003.

* Starting in late June, 2003, Strunk tried physical therapy as a treatment for her neck pain.  This was not helpful, and Dana Rabideau, M.D., Strunk's physician, referred Strunk to an neurosurgeon.

* An entry in Unum's Activity Log dated June 26 and 27,

2003, indicated that Kathy Cook in Human Resources, presumably at Healthsouth, was contacted by Unum and informed Unum that light duty was not available in Strunk's position.  The entry also noted that "[p]er account database," Healthsouth "does not accommodate."

* On July 1, 2003, Unum wrote Strunk and informed her that her claim for short term disability benefits had been approved from June 25, 2003, through July 7, 2003.  The letter advised Strunk that if she could not return to work on July 8, 2003, she would be required to have her attending physician provide medical records, a list of activities she could not perform and an explanation for the restrictions, and a copy of her treatment and return to work plans.  The letter instructed Strunk to "[m]ake this letter available to your physician(s) and request that your physician(s) mail or fax this information to us," and cautioned that "[a] note from your physician saying you cannot return to work will not be acceptable without the supporting medical data listed above."

* On July 17, 2003, Strunk saw Anthony Capocelli, M.D., a neurosurgeon.  Dr. Capocelli diagnosed a disc herniation at C6-7, and recommended an anterior cervical discectomy and fusion.

* On August 4, 2003, Dr. Capocelli performed the

-4-

recommended procedure.

* On September 16, 2003, Strunk returned for her first post-operative visit. Dr. Capocelli noted that the surgical wound was well-healed, and that Strunk was "just having some relatively mild stiffness in the neck and occasional pain effected by turning in certain positions which I would expect is fairly normal at this time." He planned on follow-ups as needed, and released Strunk to return to work for four hours a day as of September 29, 2003, for a period of two weeks, after which he indicated that he would allow her to "progress to full time hours."

* On September 30, 2003, Dr. Capocelli's nurse made a note in Strunk's chart, stating that Strunk "came into office - states is unable to work 4 hours due to work requires 8 hours [with no] restrictions - given note for off work until 10/13/03 & then return @ 8 hrs."

* On October 1, 2003, Unum notified Strunk that her short term benefits had been approved through October 12, 2003, noting that it was Unum's understanding that Strunk would be returning to work on October 13, 2003.

* On October 6, 2003, Strunk called Unum and told the claims examiner that she had been terminated by her employer.

\*     On December 3, 2003, Unum called Healthsouth and spoke to an employee there who confirmed that Strunk had not returned to work, and that she did not have any details about why, but that "she had an LTD [long term disability] form on her desk to fill out and send to us 'when she gets around to it'."

\*     On December 23, 2003, Strunk was examined by Dr. Capocelli, who noted that she had returned to work for a few days "and was having pain and difficulties and apparently was fired from her job.  She was unable really to do the job with some significant symptoms after only 1-2 hours and it was our thought at that time that we went ahead and took her off of work.  Subsequently to that, she has not been able to come to see us until now and is unable to work during that time period."  As for her current condition, Dr. Capocelli noted that Strunk "continues to have ongoing radicular pain though improved," that she had "spasms in the trapezius," and that "[n]eurologically, she is intact, but does have clear cut radicular symptomatology better than previous but certainly present."  Dr. Capocelli ordered an MRI and cervical spine x-rays, and stated that in the interim, "I believe at this point that she is disabled and unable to work."

\*       Also on December 23, 2003, Unum notified Strunk that it

        had reviewed her short term disability claim, and that

        "[b]ased on the information in our file, there is no

        disability supported by medical documentation."  Unum

        stated that benefits would not be paid beyond October

        12, 2003, and the claim would be closed.

\*       On December 30, 2003, Strunk underwent an MRI and x-rays

        of her cervical spine.  The MRI was reported as "#1

        Anterior screw and side-plate device at C6-7 without

        complication. #2 Small central to left-sided focal disk

        protrusion at C2-3 and a small central disk bulge at C3-

        4.  Neither of these results in a significant canal

        stenosis."  The x-rays were reported as "[p]ostsurgical

        findings of C6 to C7 as described.  Degenerative

        spurring apparent in the mid cervical area.  Some

        anterior ligamentous ossification also incidentally

        noted at C3-4 and C4-5.  No acute change from prior

        study 08/04/03."

\*       On January 19, 2004, Strunk's attorney lodged an appeal

        on her behalf with Unum.  In his letter he noted that

        Strunk had "attempted to return to work as directed,"

        but that "[p]rior to transitioning from part-time to

        full-time work on a trial basis as recommended by her

        treating neurosurgeon, HealthSouth released the Claimant

from work on or about 10/1/03. Stated grounds were that Claimant was occupying a full-time job and therefore was expected to do full-time work, but was unable to do so." The letter further stated that it was "Claimant's position that she is totally disabled and unable to work as of 12/23/03."

* On February 12, 2004, in response to a question from Unum, a Healthsouth employee stated that Strunk "returned to work for 10 hrs during payperiod 09/21 - 10/04/03. Her term date was on 10/03/03 - it was a voluntary quit."

* On March 2, 2004, Dr. Capocelli examined Strunk, stating that "according to her studies [she] remains stable but she is continuing to have residual difficulties. At this point, I do not believe she is ever going to be able to return to her premorbid work duty and at this point she is disabled. Though she has had some improvement to the point that she can at least be moderately function [sic] with her activities of daily living, there is no way that she can return to her premorbid work duty. This is also compounded by multiple other medical problems in addition to her underlying spine disease all of which culminate in her inability to return to her premorbid work. At this point, we will just followup with her

p.r.n. [as needed]."

\* On March 22, 2004, Richard Tyler, M.D., an orthopedic surgeon, reviewed Strunk's file for Unum. It was Dr. Tyler's opinion that the "[r]ecord does not provide any explanation for failure to seek medical attention during hiatus of more than three months," from September 16 until December 23, 2003, and that the examination on December 23 was "unremarkable." Dr. Tyler's opinion was that Strunk's continuing neck and right upper extremity pain would support limitations on "repetitious rotational or flexion/extension mobilization of the neck," but would not support an inability to "carry out activities while sedentary." Dr. Tyler also stated that the additional tests ordered by Dr. Capocelli in December, 2003, would provide a better understanding of Strunk's clinical status.

\* Also on March 22, 2003, Unum notified Strunk that it had completed appellate review of her claim and had determined that the decision to deny benefits was appropriate. It based this decision on the unexplained lack of medical treatment between September 16, 2003, and December 23, 2003, "for symptoms [Strunk] claims are disabling," and the lack of support for restrictions or limitations during the time Strunk was released to work.

It also noted "the claim that her employment was terminated because of her inability to perform the job duties on a full time basis appears unfounded."

* On April 13, 2004, Dr. Capocelli signed a "To Whom It May Concern" note stating that "Strunk was seen in our clinic on 12-23-03 which was the earliest possible appointment that we could see her after she called us on 09-30-03 regarding her work status. We did try to get her in sooner than that, but unfortunately due to scheduling problems were unable to see her until 12-23-03 and hence, the delay in making final recommendations regarding her work, etc."

* Also on April 13, 2004, Strunk's attorney wrote Unum, enclosing various medical reports. The attorney stated, with regard to Strunk's termination at Healthsouth: "The claimant attempted to return to work on 9/29/03 as instructed in the doctor's note attached above. She worked for 4 hours the first day, 4 hours the second day, and 2 hours the next day for a total of 10 hurs. She was instructed that if she could not do a full time job she would be placed on personal leave and that at the end of any personal leave there would not be a position available to her and she would not be returned to work. This is not a voluntary quit, but an

involuntary termination, contrary to the doctor's
orders.  It is obvious that the claimant was terminated
because she could not perform the 'material and
substantial duties' of her job even with modifications
and omissions."

*     On May 10, 2004, Unum notified Strunk that it had again
upheld the denial of benefits.  The letter explained
that the additional medical documentation supplied by
Strunk did not "document any acute or significant
changes from the prior studies done on August 4, 2003,
and that while Dr. Capocelli "reference[d] multiple
medical problems, . . . he does not provide any
description on how these medical problems affect Ms.
Strunk's ability to perform the duties of her
occupation."  It further noted "there still exists a
substantial period of time in which there are no medical
records, physical exams, or testing to support a lack of
functional ability," and that the medical records "still
do[] not explain why Ms. Strunk did not return to work
full time as instructed by Dr. Capocelli." The letter
also stated Unum's perception that Healthsouth had
offered to allow Strunk to continue her personal leave.

*     On May 28, 2004, Dr. Capocelli signed a "To Whom It May
Concern" note stating that "we did attempt to return

this patient to full work, but throughout this time period, the patient was unable to tolerate the work secondary to low back pain and difficulty relating to her injury. The result was that she was taken off work. Though the studies did not show any definitive changes, the underlying nerve injury from the original herniation has left the patient functionally unable to perform her premorbid work activity."

5. When the foregoing history of this claim is viewed as a whole, the Court finds substantial evidence supporting Unum's conclusion that Strunk's benefits should be terminated as of October 12, 2003. Certainly it cannot be said that no reasonable person could have reached the decision reached by Unum in this case.

Under the terms of the Policy, it is a basis for termination of benefits that a participant is no longer disabled under the terms of the plan," i.e., that she is no longer "limited from performing the material and substantial duties" of her regular occupation due to her sickness. There is substantial evidence that Strunk had reached this point by October 12, 2003. Strunk had a good outcome from her fusion, and was experiencing only normal pain and stiffness five weeks after surgery. She was in good enough shape that Dr. Capocelli released her to return to work as of September 29, 2003, with no limitation other than that

she ease back into full-time work with a two-week period of part-time work.  The release was later altered to allow her to simply return to work full-time as of October 13, 2003, with no limitations on time or function.

In spite of the second release to work, it appears that Strunk tried to return to work part-time at the earlier date, and that Healthsouth, unwilling to allow part-time work, terminated Strunk before she reached the date when she had been released to work full-time.  The evidence does not, however, support a conclusion that Strunk tried to work and was unable to perform the essential duties of her job.  The chart entry of Dr. Capocelli's nurse on September 30, 2003, was to the effect that Strunk could not work four hours because her job required her to work eight hours.  Strunk's attorney explained the termination as being based on Strunk's not being able to work a full eight hours immediately upon her return to work.

As for Strunk's physical condition, Dr. Capocelli placed no restrictions on her return to work except easing into it by working four hours a day at first, and on September 30, 2003, after being told that Healthsouth would not permit that, he allowed her to wait until October 13, 2003, and then return to work full-time with no restrictions.  In December, Dr. Capocelli noted that Strunk continued to have radicular pain, but that she was "improved," and that even with trapezius spasms she was

-13-

"better than previous."  The MRI and x-rays taken on December 30, 2003, were unremarkable.  Dr. Capocelli's opinion in March was that Strunk "remains stable," albeit with "residual difficulties." While Dr. Capocelli stated that Strunk was disabled, until the final "To Whom It May Concern" note, he gave no explanation for why he held this opinion, and his medical records offer nothing to justify it.  The May 28, 2004, note, while it offers "underlying nerve injury" as a basis for a finding of disability, is not supported by any nerve studies, nor is it particularly credible in light of Dr. Capocelli's position on Strunk's work ability in September.

Dr. Tyler, reviewing Dr. Capocelli's records and the radiologic studies, pointed out the unexplained three-month gap in treatment from September 16, 2003, to December 23, 2003, and the unremarkable physical findings in December.  While Strunk and Dr. Capocelli suggest that scheduling problems explain the gap, Unum was certainly justified in finding such an explanation less than credible on the part of both patient and physician, given their position that in the wake of a serious operation the patient was deteriorating from "return to work" status to "disabled."

Dr. Tyler felt that Strunk would need certain accommodations in her job, but that she was capable of carrying out sedentary work.  Healthsouth's reluctance to offer those accommodations does not merit a finding of disability for purposes of the Plan,

-14-

although it may well be a legitimate subject of litigation for other reasons.

For all these reasons, the Court finds that the decision of Unum was supported by substantial evidence, and should be affirmed.

**IT IS THEREFORE ORDERED** that the decision of Unum Life Insurance Company of America to terminate the short term disability benefits of Janet L. Strunk is **affirmed.**

**IT IS SO ORDERED.**

          **/s/ Jimm Larry Hendren**
        **JIMM LARRY HENDREN**
        **UNITED STATES DISTRICT JUDGE**